UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>*Plaintiff*,<br><br>v.<br><br>RICHARD D. FAIRBANK<br><br>*Defendant*. | Civil Action No. |

## COMPETITIVE IMPACT STATEMENT

The United States of America ("United States"), under Section 2(b) of the Antitrust

Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h) ("APPA" or "Tunney Act"), files this

Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in

this civil antitrust proceeding.

## I.    NATURE AND PURPOSE OF THE PROCEEDING

On September 2, 2021, the United States filed a Complaint against Defendant Richard D.

Fairbank ("Fairbank"), related to Fairbank's acquisitions of voting securities of Capital One

Financial Corporation ("COF") in March 2018.  The Complaint alleges that Fairbank violated

Section 7A of the Clayton Act, 15 U.S.C. § 18a, commonly known as the Hart-Scott-Rodino

Antitrust Improvements Act of 1976 (the "HSR Act").  The HSR Act requires certain acquiring

persons and certain persons whose voting securities or assets are acquired to file notifications

with the United States Department of Justice and the Federal Trade Commission (collectively,

the "federal antitrust agencies") and to observe a waiting period before consummating certain

acquisitions of voting securities or assets.  15 U.S.C. § 18a (a) and (b).  These notification and

waiting period requirements apply to acquisitions that meet the HSR Act's size of transaction and size of person thresholds, which have been adjusted annually since 2004.  The size of transaction threshold is met for transactions valued over $50 million, as adjusted ($84.4 million for most of 2018).  In addition, there is a separate filing requirement for transactions in which the acquirer will hold voting securities in excess of $100 million, as adjusted ($168.8 million in 2018), and for transactions in which the acquirer will hold voting securities in excess of $500 million, as adjusted ($843.9 million in 2018).

With respect to the size of person thresholds, the HSR Act requires one person involved in the transaction to have sales or assets in excess of $10 million, as adjusted ($16.9 million in 2018), and the other person to have sales or assets in excess of $100 million, as adjusted ($168.8 million in 2018).  A key purpose of the notification and waiting period requirements is to protect consumers and competition from potentially anticompetitive transactions by providing the federal antitrust agencies an opportunity to conduct an antitrust review of proposed transactions before they are consummated.

Section 802.21 of the HSR Rules, 16 C.F.R. § 802.21, provides that, once a person has filed under the HSR Act and the waiting period has expired, the person can acquire additional voting securities of the same issuer without filing a new notification for five years from the expiration of the waiting period, so long as the value of the person's holdings do not exceed a threshold higher than was indicated in the filing ("802.21 exemption").

The Complaint alleges that Fairbank acquired voting securities of COF without filing the required pre-acquisition HSR Act notifications with the federal antitrust agencies and without observing the waiting period.  Fairbank's acquisition of COF voting securities exceeded the $100-million statutory threshold, as adjusted, ($168.8 million at the time of the acquisition) and

Fairbank and COF met the then-applicable statutory size of person thresholds (which were $16.9 and $168.8 million, respectively).  Moreover, although Fairbank was not a new investor in COF voting securities at the time of the acquisition, his transaction did not satisfy the requirements of the 802.21 exemption.

At the same time the Complaint was filed in the present action, the United States also filed a Stipulation and proposed Final Judgment that resolves the allegations stated in the complaint.  The proposed Final Judgment is designed to address the violation alleged in the Complaint and penalize Fairbank's HSR Act violations.  Under the proposed Final Judgment, Fairbank must pay a civil penalty to the United States in the amount of $637,950.

The United States and the Defendant have stipulated that the proposed Final Judgment may be entered after compliance with the APPA, unless the United States first withdraws its consent.  Entry of the proposed Final Judgment will terminate this action, except that the Court will retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and punish violations thereof.

## II.    DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATION

The crux of Fairbank's violation is that he failed to submit an HSR notification even though his acquisition of COF voting securities as part of his compensation package satisfied the HSR filing requirements and he was not eligible to take advantage of the 802.21 exemption.  At all times relevant to the Complaint, Fairbank had sales or assets in excess of $16.9 million.  At all times relevant to the Complaint, COF had sales or assets in excess of $168.8 million.

Fairbank is Chief Executive Officer of COF and in that capacity, he frequently receives performance stock units ("PSUs") as a part of his compensation package.  On February 5, 2013, due to the imminent vesting of PSUs, Fairbank made an HSR filing for an acquisition of COF

voting securities that would result in holdings exceeding the adjusted $100 million threshold then in effect of $168.8 million.  The waiting period for the filing expired on March 7, 2013, and Fairbank commenced the acquisition four days later.  For a period of five years, until March 6, 2018, Fairbank was permitted under the 802.21 exemption to acquire additional voting securities of COF without making another HSR Act filing so long as he did not exceed the $500 million threshold, as adjusted.

On March 8, 2018, more than five years after expiration of the waiting period for the February 5, 2013 filing, Fairbank acquired 101,148 voting securities of COF due to vesting PSUs.  Even though this acquisition did not bring Fairbank's holdings over the next highest threshold ($500 million, as adjusted), he was required to make an HSR Act filing because the five-year exemption period of his 2013 filing had ended.  As a result of the March 2018 acquisition, Fairbank held voting securities of COF valued in excess of the $100 million threshold, as adjusted, which in 2018 was $168.8 million.  Although required to do so, Fairbank did not file under the HSR Act or observe the HSR Act's waiting period prior to completing the March 8, 2018 transaction.

Fairbank made a corrective HSR Act filing on December 18, 2019, promptly after learning that this acquisition was subject to the HSR Act's requirements and that he was obligated to file.  The waiting period for that corrective filing expired on January 17, 2020.

The Complaint further alleges that Fairbank's March 2018 HSR Act violation was not the first time Fairbank had failed to observe the HSR Act's notification and waiting period requirements.  In 1999 and 2004, Fairbank acquired voting securities of COF that resulted in his holdings exceeding the then-applicable HSR notification thresholds.  Although he was required to do so, Fairbank did not file under the HSR Act prior to acquiring COF voting securities in

4

1999 and 2004.  On February 12, 2008, Fairbank made a corrective filing under the HSR Act for

the acquisitions of COF voting securities he had made in 1999 and 2004.  In a letter

accompanying the corrective filing, Fairbank acknowledged that the transactions were reportable

under the HSR Act, but asserted that the failure to file and observe the waiting period was

inadvertent.  Fairbank outlined in his letter a system he would implement to ensure that all future

reportable acquisitions would be identified and the required HSR notifications filed.  The Federal

Trade Commission did not seek civil penalties against Fairbank for the 1999 and 2004 COF

acquisitions.

## III.    EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The proposed Final Judgment imposes a $637,950 civil penalty designed to address the

violation alleged in the Complaint, penalize the Defendant, and deter others from violating the

HSR Act.  The United States adjusted the penalty downward from the maximum permitted under

the HSR Act because the violation was inadvertent, the Defendant promptly self-reported the

violation after discovery, and the Defendant is willing to resolve the matter by consent decree

and thereby avoid prolonged investigation and litigation.  The penalty will not have any adverse

effect on competition; instead, the relief will have a beneficial effect on competition because the

federal antitrust agencies will be properly notified of future acquisitions, in accordance with the

law.

## IV.    REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

There is no private antitrust action for HSR Act violations; therefore, entry of the

proposed Final Judgment will neither impair nor assist the bringing of any private antitrust

action.

## V.   PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and the Defendant have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent.  The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment.  Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the *Federal Register*, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later.  All comments received during this period will be considered by the United States, which remains free to withdraw its consent to the proposed Final Judgment at any time before the Court's entry of the Final Judgment.  The comments and the response of the United States will be filed with the Court.  In addition, comments will be posted on the U.S. Department of Justice, Antitrust Division's internet website and, under certain circumstances, published in the *Federal Register.*  Written comments should be submitted to:

> Maribeth Petrizzi
> Special Attorney, United States
> c/o Federal Trade Commission
> 600 Pennsylvania Avenue, NW
> CC-8416
> Washington, D.C. 20580
> Email: bccompliance@ftc.gov

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI.   ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a full trial on the merits against the Defendant.  The United States is satisfied, however, that the proposed relief is an appropriate remedy in this matter.  Given the facts of this case, including the Defendant's self-reporting of the violation and willingness to promptly settle this matter, the United States is satisfied that the proposed civil penalty is sufficient to address the violation alleged in the Complaint and to deter violations by similarly situated entities in the future, without the time, expense, and uncertainty of a full trial on the merits.

## VII.   STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a 60-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest."  15 U.S.C. § 16(e)(1).  In making that determination, the Court, in accordance with the statute as amended in 2004, is required to consider:

> (A)    the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

> (B)    the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint

including consideration of the public benefit, if any, to be derived from a
determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B).  In considering these statutory factors, the Court's inquiry is
necessarily a limited one as the government is entitled to "broad discretion to settle with the
defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d
1448, 1461 (D.C. Cir. 1995); *United States v. U.S. Airways Grp., Inc.*, 38 F. Supp. 3d 69, 75
(D.D.C. 2014) (explaining that the "court's inquiry is limited" in Tunney Act settlements);
*United States v. InBev N.V./S.A.*, No. 08-1965 (JR), 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C.
Aug. 11, 2009) (noting that a court's review of a consent judgment is limited and only inquires
"into whether the government's determination that the proposed remedies will cure the antitrust
violations alleged in the complaint was reasonable, and whether the mechanism to enforce the
final judgment are clear and manageable").

As the U.S. Court of Appeals for the District of Columbia Circuit has held, under the
APPA a court considers, among other things, the relationship between the remedy secured and
the specific allegations in the government's complaint, whether the proposed Final Judgment is
sufficiently clear, whether its enforcement mechanisms are sufficient, and whether it may
positively harm third parties.  *See Microsoft*, 56 F.3d at 1458-62.  With respect to the adequacy
of the relief secured by the proposed Final Judgment, a court may not "make de novo
determination of facts and issues." *United States v. W. Elec. Co.*, 993 F.2d 1572, 1577 (D.C. Cir.
1993) (quotation marks omitted); *see also Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa,
Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001); *United States v. Enova Corp.*, 107 F. Supp. 2d 10, 16
(D.D.C. 2000); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3.  Instead, "[t]he balancing of
competing social and political interests affected by a proposed antitrust consent decree must be
left, in the first instance, to the discretion of the Attorney General." *W. Elec. Co.*, 993 F.2d at

8

1577 (quotation marks omitted).  "The court should bear in mind the *flexibility* of the public interest inquiry: the court's function is not to determine whether the resulting array of rights and liabilities is one that will *best* serve society, but only to confirm that the resulting settlement is within the *reaches* of the public interest."  *Microsoft*, 56 F.3d at 1460 (quotation marks omitted); *see also United States v. Deutsche Telekom AG*, No. 19-2232 (TJK), 2020 WL 1873555, at *7 (D.D.C. Apr. 14, 2020).  More demanding requirements would "have enormous practical consequences for the government's ability to negotiate future settlements," contrary to congressional intent.  *Id.* at 1456.  "The Tunney Act was not intended to create a disincentive to the use of the consent decree." *Id.*

The United States' predictions about the efficacy of the remedy are to be afforded deference by the Court.  *See, e.g.*, *Microsoft*, 56 F.3d at 1461 (recognizing courts should give "due respect to the Justice Department's . . . view of the nature of its case"); *United States v. Iron Mountain, Inc.*, 217 F. Supp. 3d 146, 152–53 (D.D.C. 2016) ("In evaluating objections to settlement agreements under the Tunney Act, a court must be mindful that [t]he government need not prove that the settlements will perfectly remedy the alleged antitrust harms[;] it need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms.") (internal citations omitted); *United States v. Republic Servs., Inc.*, 723 F. Supp. 2d 157, 160 (D.D.C. 2010) (noting "the deferential review to which the government's proposed remedy is accorded"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) ("A district court must accord due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case.").  The ultimate question is whether "the remedies [obtained by the Final Judgment are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the

9

public interest.'" *Microsoft*, 56 F.3d at 1461 (*quoting W. Elec. Co.*, 900 F.2d at 309).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459; *see also U.S. Airways*, 38 F. Supp. 3d at 75 (noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 ("[T]he 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged."). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d at 1459-60.

In its 2004 amendments to the APPA, Congress made clear its intent to preserve the practical benefits of using consent judgments proposed by the United States in antitrust enforcement, Pub. L. 108-237 § 221, and added the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2); *see also U.S. Airways*, 38 F. Supp. 3d at 76 (indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act). This language explicitly wrote into the statute what Congress intended when it first enacted the Tunney Act in 1974. As Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended

proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process."  119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney).  "A court can make its public interest determination based on the competitive impact statement and response to public comments alone."  *U.S. Airways*, 38 F. Supp. 3d at 76 (citing *Enova Corp.*, 107 F. Supp. 2d at 17).

## VIII.   DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Date: September 2, 2021                                    Respectfully submitted,


/s/ Kenneth A. Libby
Kenneth A. Libby
Special Attorney
U.S. Department of Justice
Antitrust Division
c/o Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20580
Phone: (202) 326-2694
Email: klibby@ftc.gov